# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                         )
JILL MARCIN,                             )
                                         )
                Plaintiff,               )
                                         )
        v.                               )        Civil Action No. 10-1816 (ABJ)
                                         )
RELIANCE STANDARD LIFE                   )
INSURANCE COMPANY, et al.,               )
                                         )
                Defendants.              )
_____)
```

## MEMORANDUM OPINION

Plaintiff Jill Marcin brings this suit against defendants Reliance Standard Life Insurance Company ("Reliance") and Mitre Corporation Long Term Disability Insurance Program ("Mitre") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiff challenges the denial of her claim for disability benefits under the long-term disability insurance policy insured by Reliance. The parties have cross-moved for summary judgment [Dkts. # 21 and # 27]. Because Reliance has failed to explain the grounds for its decision denying plaintiff benefits, the Court will remand to Reliance for reconsideration of that decision. Accordingly, plaintiff's motion for summary judgment [Dkt. # 21] is granted in part and denied in part and defendants' cross-motion for summary judgment [Dkt. # 27] is denied.

## I.    BACKGROUND

### A.  Mitre's Long-Term Disability Insurance Policy

Plaintiff worked as a multi-discipline systems engineer at Mitre, a non-profit organization that supports federally funded research and development centers with systems engineering and

information technology assistance.  Pl.'s Mem. at 2; Administrative Record ("A.R.") at 14.[1]  On

January 1, 2005, Reliance issued "Group Long-Term Disability Insurance Policy No.

LTD111701" ("the Policy" or "the Plan") to Mitre.  A.R. at 14.  Defendant Reliance acted as the

claims review fiduciary and determined eligibility for benefits for the Policy.  A.R. at 14.

In order to be eligible for disability benefits, the Policy required an insured:  (1) to be

"Totally Disabled as the result of a Sickness or Injury covered by this Policy;" (2) to be "under

the regular care of a Physician;" (3) to "ha[ve] completed the Elimination Period;" and (4) to

"submit[] satisfactory proof of Total Disability."  A.R. at 18.  In a provision that can hardly be

described as a model of clarity, the Policy defined "Totally Disabled" and "Total Disability" as:

> [A]s a result of an Injury or Sickness:
>
> (1)     [D]uring the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
>
> a.     "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
>
> b.     "Residual Disability" means being Partially Disabled during the Elimination Period.   Residual Disability will be considered Total Disability; and
>
> (2)     [A]fter a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation.  Any occupation is one that the Insured's education, training or experience will reasonably allow.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

A.R. at 10.

---

1     *See also* Mitre – Applying Systems Engineering and Advanced Technology to Critical National Problems, http://www.mitre.org/ (last visited Sept. 21, 2012).

The definition of "Total Disability" refers to the "Elimination Period," which is in turn defined by reference to the disability. The term "Elimination Period" is defined as a "period of consecutive days of Total Disability . . . for which no benefit is payable. It begins on the first day of Total Disability." A.R. at 9. The Policy also states that the Elimination Period is "[t]he greater of expiration: 180 consecutive days of Total Disability or the end of The MITRE Corporation's continuation program." A.R. at 7.

Further, the Policy uses the term "Interruption Period," which is defined as:

> If, during the Elimination Period, an Insured returns to Active Work for less than 160 hours, then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period.

A.R. at 9. Finally, the term "Actively at Work" is defined as:

> [A]ctually performing on a Full-time or Part-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness.

*Id.*

### B. Plaintiff's claim for disability benefits

Plaintiff was initially diagnosed with serious medical issues including kidney cancer and portal vein thrombosis in November 2005, and the Administrative Record chronicles in great detail the many doctors' appointments, diagnoses, and medical exams she underwent from 2005 to 2007. *See, e.g.,* A.R. 796–98 (recording plaintiff's diagnosis of enlargement of the spleen and portal vein thrombosis by Dr. Sutherland); A.R. at 863–67 (results of Magnetic Resonance Imaging ("MRI") exam showing worsening of her condition); A.R. at 395–97; 712–15; 791–92; 826–27; 853–55 (diagnosis and treatment of renal cell carcinoma). According to the Administrative Record, August 19, 2007, was the last day plaintiff worked before her disability.

A.R. at 657.  Plaintiff indicates that she returned to work briefly in November 2007, although she does not specify a precise date.  *Id.*  Reliance estimated that she began part-time work on November 12, 2007.  A.R. at 742.

On December 18, 2007, Mitre provided Reliance notice of plaintiff's claim of disability. A.R. at 1482.  During the period from mid-November 2007 to mid-February 2008, plaintiff worked a reduced number of hours, which varied based on the particular week.  A.R. at 742.  On February 15, 2008, plaintiff stopped working altogether.  A.R. at 742.  On March 25, 2008, plaintiff submitted a written application for disability benefits under the Policy.  A.R. at 657–66.

### C.  Reliance's Denial of the Plaintiff's Claim for Disability Benefits

After considering materials submitted by plaintiff as well as reviews provided by physicians consulted by Reliance, Reliance initially denied plaintiff's claim on June 11, 2008. A.R. at 741–44.  The denial was based on the grounds that "the medical records in the file do not support work impairment at date of loss or beyond 11/6/07 when you were released to work status post nephrectomy."  A.R. at 743.

Plaintiff appealed the decision on December 29, 2008.  A.R. at 996–1028.  Reliance denied the appeal on September 29, 2009.  A.R. at 111–20.  The denial letter sent to plaintiff provided in relevant part:

> At the time that [plaintiff] returned to "Active Work" in 11/07, she was still within the "Elimination Period" as it is defined by the Policy for her 8/20.07 dates of loss.  Hence, as [plaintiff] was working part-time, the Claims Department was required to add the number of hours that [plaintiff] worked during the "Interruption Period" to the end of her "Elimination Period."

> Documentation from the Policyholder confirms [plaintiff] was "Actively at Work" during the following time frame:

| Week of | Total Hours Worked |
|---|---|
| 11/12/07 to 11/18/07 | 24 hrs |
| 11/19/07 to 11/25/07 | 17 hrs |
| 11/26/07 to 12/02/07 | 26 hrs |
| 12/03/07 to 12/09/07 | 22 hrs |
| 12/10/07 to 12/16/07 | 29 hrs |
| 12/17/07 to 12/23/07 | 28 hrs |
| 12/24/07 to 12/30/07 | no work |
| 12/31/07 to 01/06/08 | 2 hours |
| 01/07/08 to 01/13/08 | 28 hours |
| 01/14/08 to 01/20/08 | no work |
| 01/21/08 to 01/27/08 | 32 hours |
| 01/28/08 to 02/03/08 | 24 hours |
| 02/04/08 to 02/10/08 | 5 hours |
| 02/11/08 to 02/17/08 | 4 hours |
| 02/18/08 | no work |

A.R. at 114 (emphasis removed).  Therefore, according to Reliance:

> In [plaintiff]'s situation, given her original work stoppage on 8/20/07, and the "Interruption Period" as explained above, [plaintiff] worked in excess of the specified "160 hours" as of 12/14/07.  Therefore, the "Elimination Period" needed to be re-started as of 12/15/07.

*Id.* (emphasis removed).

The letter continued:

> However, as of 2/18/08, when [plaintiff] ceased working entirely, information in the claim file reflects that [plaintiff] was still receiving salary continuation from the Mitre Corporation.  Hence, according to the provisions set forth in the group Policy, [plaintiff]'s "Elimination Period" would be satisfied <u>after the greater of </u>180 days of "Total Disability" beginning 2/18/08, or the last date that she received salary continuation from her employer.  *It is our position, based on the totality of information in the claim file, that [plaintiff] was capable of performing the material duties of her own occupation[2] at the time that she was released to return to work on 11/6/07 following her nephrectomy.*

*Id.* (emphasis added).

Reliance then discusses the sufficiency of the medical evidence submitted in support of plaintiff's claims.  The letter pointed to the following:

*1.  Progress Notes from Dr. Felice*

The denial letter noted several progress notes from Anthony Felice, M.D., an oncologist who treated plaintiff.  The first note, dated December 31, 2007, states that plaintiff "was doing reasonably well with the exception of experiencing mild fatigue and anemia." A.R. at 114, citing A.R. at 735.  The denial letter from Reliance remarks that this note was written after plaintiff returned to work part-time but before she stopped working altogether, and that it does not include any recommendation that she stop working.  A.R. at 114–14.

---

2      Reliance assessed the material duties of plaintiff's occupation by using the Dictionary of Occupation Titles ("DOT") published by the U.S. Department of Labor.  A.R. at 112.  In plaintiff's case, her position as a multi-discipline systems engineer was closest to a combination of two DOTs.  The first was DOT 019.167-014, Project Engineer, which is classified as "light physical exertion."  *Id.*  The second was DOR 033.167-010, Computer Systems Engineer, which is classified as "sedentary exertion."  *Id.*

According to the DOT, a sedentary occupation is one which "requires exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body."  *Id.* n.2.  Sedentary work includes "sitting most of the time, but may involve walking or standing for brief periods of time."  *Id.*

The letter then references another office note from Dr. Felice on February 29, 2008 – two weeks after plaintiff had stopped working. *Id.* The letter states that plaintiff "was feeling better but experiencing some fatigue." *Id.*, citing A.R. at 786. The letter also noted Dr. Felice's comment that plaintiff was being treated for a sinus infection and a yeast infection and that "neither of which are conditions that preclude individuals from work function." A.R. at 115. The denial letter also observed:

> When [plaintiff] saw Dr. Felice in 12/07, he did not recommend a decrease in her part-time work, nor did he recommend that she cease working due to her complaints of fatigue. As [sic] [plaintiff] next saw this provider in 2/08, two weeks *after* she had stopped working. Thus it is apparent that Dr. Felice did not propose that [plaintiff] discontinue her work due to her medical conditions.

*Id.*

### 2. Attending Physician Statement completed by Dr. Abu-Elbmagd

The denial letter also notes that in March 2008, Kareen Abu-Elmagd, M.D., completed an Attending Physician Statement ("APS") that was submitted in connection with plaintiff's claim for disability benefits. A.R. at 113, 115, citing A.R. at 665–66. The APS indicated that plaintiff's primary diagnoses and symptoms consisted of "extreme fatigue, frequent illness." A.R. at 665. According to the denial letter, the APS also included a section entitled "Description of Patient's Restrictions and Limitations," in which Dr. Abu-Elmagd indicated that plaintiff could stand for 1–3 hours, sit for 3–5 hours, walk for 1–3 hours, and drive for 1–3 hours. A.R. at 666. He also noted that in an eight-hour day, plaintiff could lift/carry ten pounds maximum and occasionally carry small objects, which is characterized by the form as "sedentary work." *Id.* The form also included a question which asked: "Has the patient achieved maximum medical improvement?" *Id.* Dr. Abu-Elmagd checked the box "no." *Id.* The APS then asked: "If yes,

as of what date can patient return to work?"  Since Dr. Abu-Elmagd checked the first box no, he

did not answer this question.  *Id.*

     While the denial letter discusses the APS completed by Dr. Abu-Elmagd, it notes that the

document was signed in March 2008, which was one month *after* plaintiff stopped working.

A.R. at 115.  Based on this, Reliance concluded:

> Indeed, according to the medical evidence, neither Dr. Abu-Elmagd nor
> Dr. Felice recommended that [plaintiff] stop working.  Given these facts,
> we must conclude that [plaintiff]'s work stoppage as of 2/18/08 was a
> lifestyle choice on her part, rather than a "Total Disability" as defined by
> the group Policy.

*Id.* (emphasis removed).

     *3.  Travel to Pittsburgh for medical treatment*

     The denial letter discusses plaintiff's treatment at the University of Pittsburgh Medical

Center beginning in late March 2008.  A.R. at 115.  It observes that in order to be treated in

Pittsburgh, plaintiff was required to commute approximately 243 miles one-way from her home.

*Id.*  According to the letter:  "The fact that she is able to sit (regardless of whether or not she is

the driver or the passenger of the vehicle) for such extended periods of time further substantiates

our position that she is not "*Totally Disabled*."  *Id.*

     *4.  Medical Reports Obtained by Reliance from Dr. Dean and Dr. Shipko*

     Because plaintiff's symptoms included both "physical and psychiatric components,"

Reliance obtained opinions from two independent physicians – Herbert Dean, M.D., and Stuart

Shipko, M.D. – who reviewed plaintiff's medical records.  A.R. at 115.  These doctors never

spoke to plaintiff and did not evaluate her medical condition in person.[3]

---

3     According to the denial letter, Reliance gave plaintiff an opportunity to review the
opinions of Dr. Dean and Dr. Shipko and submit supplemental evidence and rebuttal arguments
before a final determination on the claim was made.  A.R. at 117.  Plaintiff's counsel did respond

Dr. Dean stated that he "agree[d] with the APS of 2008 [completed by Dr. Abu-Elmagd] except for the category of lifting and sitting.  During an 8 hour day with two breaks and lunch, [plaintiff] should be able to sit for up to 6 hours, walk and stand for up to 3 hours, and drive up to 3 hours; she should be able to lift up to 20 lbs occasionally and 10 lbs frequently.  Her records indicate frequent traveling to [Pittsburgh], over 200 miles for medical follow ups, which usually go along with an adequate performance level, and I would place her work capacity in an approximate light category of work . . . from the medical records that I have reviewed."  A.R. at 116.  Dr. Dean declined to assess plaintiff's cognitive issues, instead suggesting that they be evaluated by an "appropriate consultant."  *Id.*   Reliance wrote in the denial letter that "Dr. Dean's opinion supports our determination that [plaintiff] was physically capable of light work function at the time she was released to return to work on 11/6/07."  *Id.*

Dr. Shipko, whom Reliance characterizes as a "mental health specialist," observed that the "records reflect longstanding but mild depression" and that plaintiff's "emotional difficulties are mild and do not rise to a level where they would be functionally impairing."  *Id.*   He concluded that "[n]o functional impairment on the basis of psychiatric illnesses is noted or otherwise illustrated in the records that I have reviewed and no restrictions and limitations are supported from a psychiatric perspective."  *Id.*

   5.   *Neuropsychology Report from Dr. Noel*

The denial letter further notes that it reviewed a report provided by plaintiff from Carolyn Noel, PhD., a neuropsychologist, dated January 26, 2009, which concluded that plaintiff had

---

to the reports, but Reliance notes that the "majority of the materials ha[d] no relevance to Ms. Marcin's claim."  *Id.*  The letter states that most of the information submitted advanced the same systemic arguments that plaintiff had pressed in this litigation, that is, that the independent physician reviews were biased because of the doctors' affiliation with the University Disability Consortium.  *Id.*

"clinically significant" deficits in Executive Functioning and Mental Flexibility.  A.R. at 117, citing A.R. at 437.

The denial letter stated that while "it is certainly possible that Dr. Noel's findings are accurate," plaintiff saw Dr. Noel nine months after she stopped working, so the report did not illuminate the question of whether plaintiff was totally disabled at the time she stopped work.  *Id.* Moreover, any impairment identified by Dr. Noel was not covered under the Policy because plaintiff's coverage terminated on 3/1/08.  *Id.*

   *6.  Reliance's conclusion that benefits should be denied*

At the conclusion of the letter, the insurer stated that plaintiff "was capable of performing the material duties of [her] own occupation as of 11/6/07," which is the approximate date that plaintiff returned to part-time work.  A.R. at 114, 119.  Reliance stated that "[o]ur position is further confirmed through the independent opinions of Drs. Dean and Shipko."  *Id.*  The letter ended:

> [W]e must conclude that [plaintiff] was not impaired through the "Elimination Period" and therefore does not meet the definition of "Totally Disabled" as defined by the group Policy.  Thus, she is not eligible to receive [long-term disability] benefits in connection with this claim.  Additionally, we have determined that [plaintiff]'s coverage under the Policy terminated as of 3/1/08.  Therefore, any impairment diagnosed after that date is not covered for a "Total Disability" either.

*Id.* (emphasis removed).

## D.  Procedural Background

Plaintiff filed this lawsuit on October 26, 2010.  [Dkt. # 1].  Plaintiff requested that the Court review the denial of benefits and determine that plaintiff is entitled to disability benefits under the Policy, as well as back benefits with interest, attorney's fees, and costs.  Compl. ¶¶ 21– 22.  In the alternative, plaintiff requested that the case be remanded to reconsider the decision to

deny plaintiff's claim.  *Id.* ¶ 24.  Plaintiff filed a motion to compel discovery on September 14, 2011, which the Court granted in part and denied in part on November 3, 2011.  [Dkt. # 15].  On January 26, 2012, plaintiff moved for summary judgment.  [Dkt. # 21].  Defendants cross-moved for summary judgment on February 22, 2012.  [Dkt. # 27].

## II.     STANDARD OF REVIEW

### A.  Cross-motions for summary judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The mere existence of some factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) (internal quotation marks omitted).

### B.  Review of benefits determinations under ERISA

ERISA provides that a participant in or beneficiary of a covered plan may sue "to recover benefits due to him under the terms of [the] plan, to enforce his rights under the terms of the plan, or to clarify [the] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  The Supreme Court has held that courts should apply a *de novo* standard – instead of the more deferential arbitrary and capricious standard – to a benefits determination under ERISA "unless the plan provides to the contrary."  *Metro. Life Ins. Co., v. Glenn*, 554 U.S. 105, 111 (2008), citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  A plan provides to the contrary when it grants its "administrator or fiduciary discretionary authority to determine eligibility for benefits."  *Id.*, quoting *Firestone*, 489 U.S. at 115 (internal quotation marks omitted).  Under those circumstances, "[t]rust principles make a deferential standard of review appropriate."  *Firestone*, 489 U.S. at 111; *cf. Fitts v. Fed. Nat'l Mortgage Ass'n*, 236 F.3d 1, 5 (D.C. Cir. 2001) (deciding when *Firestone*'s exception applies).

When evaluating whether an abuse of discretion has occurred, the D.C. Circuit has explained that the "essential inquiry" is:  did the administrator "reasonably construe and apply" the plan?  *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1454 (D.C. Cir. 1992).  The Court's review of a benefits determination "may only be based on the record available to the administrator or fiduciary at the time the decision was made."  *Crummett v. Metro. Life Ins. Co.*, No. 06-01450,

2007 WL 2071704, at *3 (D.D.C. July 16, 2007).  This means a court cannot overturn a decision

so long as it is reasonable, "even if an alternative decision also could have been considered

reasonable." *Block*, 952 F.2d at 1452 (internal quotation marks omitted); *Mobley v. Cont'l Cas.

Co.*, 405 F. Supp. 2d 42, 48 (D.D.C. 2005) ("[A] deferential standard of review allows the plan

administrator to reach a conclusion that may technically be incorrect so long as it is reasonably

supported by the administrative record.").  The administrator's decision should therefore not be

overturned if it is the result of a "deliberate, principled, reasonable process and if it is supported

by substantial evidence, meaning it must be "more than a scintilla but less than preponderance."

*Buford v. UNUM Life Ins. Co. of Am.*, 290 F. Supp. 2d 92, 100 (D.D.C. 2003) (internal quotation

marks and citation omitted).

　　　　The policy at issue in this case provides:

> Reliance Standard Life Insurance Company shall serve as the claims review
> fiduciary with respect to the insurance policy and the Plan.  The claims review
> fiduciary has the discretionary authority to interpret the Plan and the insurance
> policy and to determine eligibility for benefits.  Decision by the claims review
> fiduciary shall be complete, final and binding on all parties.

A.R. at 14.  As the Court has noted in previous proceedings, the parties agree that a discretionary

standard of review applies in this case.  Pl.'s Mem. of P. and A. in Supp. of Pl.'s Mot. for Summ.

J. ("Pl.'s Mem.") [Dkt. # 21] at 16–18; Defs.' Mem. of P. and A. in Supp. of Cross-Mot. for

Summ. J. and Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Mem.") [Dkt. # 25] at 18.  Accordingly,

the Court will review the benefits determination under an abuse of discretion standard.

## III.   ANALYSIS

### A.  The Court's analysis of the record

　　　　In order to resolve the question posed by this case, the Court found it necessary to

undertake the detailed analysis of the record and chronology of events that was absent from the

briefs.  At oral argument, counsel for plaintiff emphasized the very serious and chronic nature of plaintiff's condition.  He maintained that she suffered from the same illnesses in 2008, as she did when later reports submitted to the insurer by the plaintiff were written, so he urged the Court to consider it all.  But the record reflects that notwithstanding her illnesses, the fact that she underwent surgery, and the fact that the doctors implanted a shunt, plaintiff was cleared by her own doctors to return to work in November 2007.  Therefore, while plaintiff's arguments about the panoply of medical conditions from which she suffers and the ever-present risk of life-threatening blood clots evoke considerable sympathy, they do not answer the only question before the Court:  was she unable to work when she stopped?  Since plaintiff's coverage expired on March 1, 2008, A.R. at 117, the record must establish that she became disabled before that time.  Her medical condition is not in dispute – only whether that condition rendered her totally disabled.

The following events transpired on the dates noted: [4]

- 11/07:  According to Reliance, plaintiff's doctors "cleared" her to return to work in November of 2007, Defs.' Mem. at 23, and in fact, she did return to work.

- 11/12–11/18/07:  Plaintiff worked twenty-four hours.

- 11/19–11/25/07:  Plaintiff worked seventeen hours.

- 11/26–12/02/07:  Plaintiff worked twenty-six hours.

- 12/03–12/09/07:  Plaintiff worked twenty-two hours.

- 12/10–12/16/07:  Plaintiff worked twenty-nine hours.

- 12/17–12/23/07:  Plaintiff worked twenty-eight hours.

- 12/24–12/30/07:  Plaintiff did not work, but this week included the Christmas holiday.

---

4       This account leaves out such items as reports of computer tomography ("CT") scans looking into spots on plaintiff's lung and other medical assessments that did not generate findings of relevance to this analysis.

A.R. at 114.

- 12/31/07:  Progress note from Dr. Felice:  In the "S" section, which sets out the patient's subjective report, it says:  "She is reasonably well although has some mild fatigue." A.R. at 735.  And, the physical examination includes the general assessment:  "The patient appears well." At that point, the plan was to continue the plaintiff on iron for her anemia and monitor closely.  *Id.*

As of this point, plaintiff is working, and she is not complaining of anything more than mild fatigue.

- 12/31/07–1/06/08:  Plaintiff worked two hours.  It is unclear whether or not this is significant given the New Year's holiday.

- 1/07–1/13/08:  Plaintiff worked twenty-eight hours.  This suggests that it was the holidays and not illness that reduced plaintiff's hours for the two previous weeks, but the record provides no further information.

- 1/14–1/ 20/08:   Plaintiff did not work; Reliance records state she was "sick." A.R. at 742.

- 1/21–1/27/08:  Plaintiff worked thirty-two hours.

- 1/28–2/3/08: Plaintiff worked twenty-four hours.

A.R. at 114.  At this point, despite her considerable medical history, plaintiff is still working, and there is no evidence of complaints made to, or diagnoses by, any physician.  So, any disability had to develop after February 3.  On the other hand, the record of part time work after the surgery could support an inference that plaintiff gave working full-time her best shot but ultimately realized that she could not sustain the necessary level of energy to succeed.

- 2/04–2/10/08:  Plaintiff worked only five hours.

- 2/11–2/17/08:  Plaintiff worked only four hours.

- 2/18/08:  Plaintiff stopped work.

A.R. at 114.

But what information is available beyond the work stoppage that indicates that plaintiff was totally disabled at that point?  The next time she goes to a doctor is ten days later, and even her own report to the doctor at that time is relatively understated in his assessment:

- 2/29/08:  Progress note from Dr. Felice:  "S:  She is feeling better but still has much fatigue.  This limits her ability to work."  Dr. Felice's "plan" includes referral to an ENT for the recurring sinus infections, a follow-up CT scan for her abdominal pain, and checking thyroid function.  A.R. at 786.

This note evidences a statement made by the patient to the doctor, and it is not a medical determination that she is disabled.  There is nothing in the progress note that elaborates further on plaintiff's ability to work from the physician's perspective.  And, as the Reliance appeal decision points out, plaintiff had already stopped work by the time she had this appointment, so it cannot be said that she stopped work based upon her doctor's instructions or recommendation.

- 3/20/08:  Progress note from Dr. Abu-Elmagd:  Plaintiff complains of ("c/o") "energy level very low," "sinus infection for 2 mo.," and "low grade fever."  "Not working presently."  (Note:  there is no complaint of syncope episodes at that point.)  The doctor's notes on examination are less legible, but they also seem to reflect complaints of fatigue, lethargy, failure to thrive, and low grade fever.  The doctor ordered various tests.  A.R. at 354–55.

Like the previous doctor's note, this piece of evidence – even if it does reflect that plaintiff was not well – does not provide much assistance in determining whether she had become disabled and if so, when her disability occurred; she was already not working when she went to see the doctor.  And, as Reliance points out, while plaintiff may not have driven herself to the appointment, she appears to have tolerated being seated for the three hours or so it took to make the trip.

- 3/20/08:  Dr. Abu-Elmagd provided plaintiff with a note on a prescription pad that states:  "Jill is currently in Pittsburgh for additional testing.  She will need to remain off of work until further notice, pending test results."  The note provides the doctor's phone number to call with any questions.  A.R. at 870.

This exhibit cannot be characterized as an express medical determination that plaintiff is disabled and unable to work, and it does not set forth the reasons for reaching such a conclusion. It is simply a note from a doctor excusing a temporary absence. But the note could be interpreted as an indication that the doctor understood that he was supporting a work stoppage of indefinite duration, and indeed, immediately after that, plaintiff submitted her claim for benefits. Still, the record does not include a discussion of the plaintiff's condition or the nature and extent of the disability.

- 3/25/08:  Plaintiff submitted her disability claim.  She listed the following symptoms:  "extreme fatigue, abdominal pain, easily caught colds."  She answered the question, "[w]hy are you unable to work?" as follows: "Unpredictable energy levels; good energy level can become instantaneously <u>very</u> low ____[illegible]. Fluctuating energy levels result in multiple days per week [without steady ___] unable to do anything; constantly catching illnesses due to weak immune system; body has not recovered fully since ___ surgery." A.R. at 657.

This is all subjective, but there is nothing in the record from the employer or anyone else that contradicts plaintiff's assessment of her abilities at that time, and there is no evidence of malingering or lack of good faith on her part.

- 3/25/08:  Dr. Abu-Elmagd completed the Reliance form in connection with plaintiff's claim for disability benefits.  He listed her primary diagnoses, and under "Symptoms," he wrote:  "extreme fatigue, frequent illness."  Section E is entitled "Description of Patient's Restrictions and Limitations," and it asks, "over the course of an 8 hour day, with 2 breaks and lunch, the patient can alternately . . . " stand, sit, walk, and drive for what period of time?  The doctor checked off:  stand for 1–3 hours, sit for 3–5 hours, walk for 1–3 hours, and drive for 1–3 hours.  He also checked the box that indicated that in an eight-hour day, the patient can lift/carry 10 lbs. maximum and occasionally carry small objects, which is characterized by the form –  not the doctor – as "sedentary work." Section F bears the instruction:   "Physician completes if limitations are mental/nervous nature," and Dr. Abu-Elmagd did not fill it out.  A.R. at 665.

Reliance interprets this assessment as evidence that plaintiff was not totally disabled, but the fact that the doctor completed the form in connection with plaintiff's disability claim is a fact to be

taken into consideration in figuring out what the form means.  As far as one can discern from the record, the physician thinks he is providing *support* for a disability claim.  Given the fact that Section E is entitled "restrictions and limitations," it seems that he is identifying these things as the upper boundaries of her abilities, denoting the *limits* on what she can do.  So at most, this document provides support for the idea that plaintiff could possibly perform some part-time work.  The fact that Dr. Abu-Elmagd did not complete Section F can be interpreted as a conclusion by him that the limitations are physical and not mental.

> Section H, "Prognosis for Recovery," asks: "Has the patient achieved maximum medical improvement?" and the doctor can check either yes or no.  Dr. Abu-Elmagd checked "no."  The form asks, "If yes, as of what date can patient *return* to work?"  Since Dr. Abu-Elmagd checked no, and not yes, he did not answer that question.  A.R. at 665.

This suggests that notwithstanding the doctor's opinion that plaintiff could sit – at most – for three to five hours in an eight-hour period, it was his understanding that she was not currently working (which is consistent with his note of March 20), and he did not contemplate a return to work at that point.  That interpretation is reinforced by his answer to the next question:

> The form then asks:  "If no, when do you expect patient will achieve maximum medical improvement?"  The doctor's answer:  "less than 16 months."  "When the above change occurs, what functional capacity will the patient receive?"  "Full recovery" is checked with the handwritten note "unknown," and "improved over current but not full" is also checked.  A.R. at 665.

So, at that point, plaintiff's doctor was anticipating that it would take some time before she recovered, and he was not able to predict whether it would be a full recovery or merely improved but not full.

Essentially, the form is somewhat ambiguous, and it has material in it to support both parties' positions.  Defendants point to the document as a strong statement of what plaintiff is capable of, and they argue that plaintiff's own physician cleared her for sedentary work.  But

Section E does not ask, what *can* she do?  It asks, how is she *limited*?  This document does not seem to provide the "substantial" support the insurer needs to support a finding that plaintiff is not disabled.  But on the other hand, there is not much in the record that supports plaintiff's claim to the insurer that she was totally disabled at that time either.  Fortunately, both parties agree that the Court can also consider any other materials that were added to the record up through the time of the appeal.

- 4/14/08:  Progress note from Dr. Felice:  Subjective section recites:  "Her main problem is one of persistent fatigue that has prevented her from working.  She also gets low grade temperatures."  The decision was made to try the drug Neupogen to "see if that makes her feel better."  A.R. at 783–84.

This is still not an express determination by Dr. Felice that plaintiff cannot work, but the document does supply yet another consistent, contemporaneous report that plaintiff  is not working because of the fatigue.

- 5/22/08:  Progress note from Dr. Abu-Elmagd:  Plaintiff first reports having the experience when her body goes limp, she can't make a sound, and ten minutes later, when she comes out of it, she is very hungry.  A.R. at 365.

In the Court's view, these syncopic episodes, which developed after plaintiff stopped working and after the policy expired, cannot supply the grounds for a disability finding; they appear to be a manifestation of how her condition subsequently worsened.

- 5/29/08:  Note in the claims file:  "Per my conversation with the insured she advised me that Dr. Abu Elmald [sic] and her discussed her quality of life and it was decided she could not work."  A.R. at 636. (Apparently, per the original claims denial, A.R. at 741–44, plaintiff made this statement to Helen M. Brenner in the Claims Department.  A.R. at 743.)

- 6/11/08:  Reliance denied plaintiff's claim for benefits on the grounds that "the medical records on file do not support work impairment at date of loss or beyond 11/6/07 when you were released to work status post nephrectomy."  A.R. at 743.

- 7/28/08:  Progress note from Dr. Felice:  Plaintiff reports episodes of syncope while sitting or standing and even driving.  He reported:  "She still complains of lack of energy."  Neurology work up was negative, so Dr. Felice referred plaintiff

to a cardiologist even though he doubted that was the cause.  Assessment includes "fatigue" and "syncope of unclear etiology." There were also issues about whether the shunt was still open.  A.R. at 780–81.

- 10/09/08:  Plaintiff was hospitalized for epilepsy monitoring; the diagnosis was that the spells were real but of psychological origin.  "[D]uring her stay, the patient underwent neuropsychological testing which demonstrated no cognitive deficits but did exhibit some signs of stress-related depression, and it was felt that counseling and cognitive behavioral therapy would be of benefit."  A.R. at 755–56.

This exhibit contradicts counsel's claim at oral argument that plaintiff's disability has been cognitive in nature.

- 10/24/08:  Functional Capabilities Test:  This report, submitted to the Court by plaintiff, concludes that plaintiff is unable to return to work in her previous position or any other position.  Workplace tolerance is below part-time workplace tolerance levels.  Much of what the report contains is plaintiff's assessment of her own condition, but there was also testing done, and the report states:  "The findings indicate that [plaintiff] tested into the full range of the sedentary (unsustainable) physical demand category and partially into the light (unsustainable) physical demand category . . . . This is not considered a sustainable capability over an 8 hour workday as she cannot sustain this level of effort for more tha[n] a short period of time.  The findings indicate she is below the 4 hour workplace tolerance level. Although she completed all functional activities, she was unable to sustain any level of effort for more than a short period of time."  A.R. at 871–75.

But does this report shed light on plaintiff's condition eight months earlier, in February 2008?  It is difficult to determine, but there does not appear to have been any worsening of plaintiff's condition since that time with the exception of the "spells," which are not relied upon as the basis for the conclusions about her functional abilities.  The level of fatigue seems consistent with what plaintiff was reporting to her physicians at that time, so the Court does not believe that this exhibit can be disregarded simply because it was prepared several months after plaintiff stopped work.

- 1/26/09:  Neuropsychology testing by Dr. Noel:  Overall impressions include: "Her general level of energy appeared sufficient, although it appeared to decrease as the day went on.  She benefited from brief breaks.  The current assessment

appears to be a valid estimate of [plaintiff]'s level of functioning." Intellectual functioning: "In summary, [plaintiff] exhibited entirely intact verbal and nonverbal intellectual abilities . . . . . " Academic Achievement test results were consistent with her intellectual abilities. Language Abilities: "These findings appear consistent with a mild executive dysfunction, as opposed to a deficit in fluency per se." Verbal/Auditory Learning and Memory: "Performance on these measures was intact." Superior range for most of it. Nonverbal/Visual Learning and Memory: intact. Motor Skills and Visual-Spatial Processing: "reduced performance on measures of fine motor control and dexterity, with intact performance on measures of motor speed and visual spatial functioning abilities." Executive Functioning/Mental Flexibility: This was an area where deficits were identified, but there is no indication that the observable deficits in executive functioning were considered to be disabling, even if they were "clinically significant." The report indicates: "Overall, data on these measures reveal evidence of executive dysfunction in the areas of auditory and visual sustained attention, response inhibition, speed of processing for complex information, and organizational and self-monitoring abilities. Throughout testing, [plaintiff] required repetition of instructions on multi-step tasks, reflecting limitations in her auditory working memory/attention span . . . . Performance appeared improved on tasks that offered more structure, which again suggests a deficit in executive skills. The reported deficits are clinically significant, particularly in light of [plaintiff's] High Average to Superior intellectual functioning." Finally, in Psychological Functioning, the report notes "evidence of significant health concerns/anxiety . . . , mild depression, and cognitive difficulties." A.R. at 431–38.

This test was performed to assess plaintiff's cognitive functioning. The fact that the report is dated almost a year after the work stoppage and that it assesses issues that were not claimed as grounds for the disability claim support Reliance's position that it should be given little or no weight. But, the report does very little to establish total disability in any event.

First of all, in the introduction, Dr. Noel characterizes the executive functioning deficits she did find as "mild." More important, once the expert took all of the strengths and weaknesses into account, she made a series of recommendations that do not include any suggestion that plaintiff is unable to work. *See* A.R. at 440. To the contrary, the bulk of the recommendations, such as use of a day planner, breaking tasks down, and taking frequent breaks, *id.*, seem to assume that she *would* be working. In addition, the test report speaks to plaintiff's ability to sit

and complete a lengthy set of tests in the course of only one day, although it does not specify exactly how long she was there.  Finally, while Dr. Noel concluded that given plaintiff's intellectual abilities, the deficits were likely acquired and not developmental, in the absence of any baseline testing information, there is no way of knowing on this record where plaintiff fell on the spectrum of executive functioning before.

What is set forth above, then, is the total state of the record if one ignores the challenged medical reviewers' reports and plaintiff's supplemental submissions.  There is nothing that points directly to a finding that plaintiff was not totally disabled other than the form her doctor completed in March 2008, and that is less compelling on that point than defendants would have the Court believe.  But there is also little in the way of medical evidence that plaintiff *was* disabled:  basically, the record consists of plaintiff's own statements, the Functional Capacities Analysis that was completed eight months after she stopped working (which does not necessarily rule out part-time, sedentary work, although it rejects it as "unsustainable"), and Dr. Abu-Elmagd's March 2008 assessment, which also doesn't rule out part-time, sedentary work.  So, whether the insurer's determination was reasonable on this record depends in large measure on what that determination was and the stated reasons behind it.

- 4/23/09:  Reliance wrote to plaintiff's counsel stating that reviews of the medical evidence by an independent physician are needed. A.R. at 382.

This is the date of the extension the insurer took that plaintiff claims was unreasonable and contrary to law.[5]

---

[5]    Plaintiffs contend that this second extension of the time was contrary to the statutory timeframe under ERISA regulation, 29 C.F.R. § 2560.503-1(i)(3).  Pl.'s Reply to Defs.' Opp. to Pl.'s Mot. for Summ. J. and Opp. to Defs.' Cross-Mot. for Summ. J. [Dkt. # 28] at 1–2, 6.  Plaintiff therefore requests that all findings made by Reliance after 3/28/09, which includes the reviews by Dr. Shipko and Dr. Dean, be stricken from the record, or, in the alternative, the Court allow plaintiff's responses to be made part of a complete record.  *Id*. at 2.

The remaining materials in the record are the expert reports.

- 5/12/09: Dr. Dean's report (which does not purport to be anything more than a "record review"):[6] Dean reviewed all of the information above and concluded: "During an 8 hour day with two breaks and lunch, she is [sic] should be able to sit for up to 6 hours, walk and stand for up to 3 hours, and drive up to 3 hours; she should be able to lift up to 20 [l]bs occasionally and 10 lbs frequently. Her records indicate frequent traveling to UPMC, over 200 miles for medical follow ups, which usually go along with an adequate performance level, and I would place her work capacity in an approximate light category of work . . . from the medical records that I have reviewed." A.R. at 306, 310.

This is hardly the nefarious document that plaintiff's counsel makes it out to be – the reviewer reaches almost the exact same conclusions as the treating physician did in March 2008, with the exception that he estimates that plaintiff could sit for up to 6 hours, when Dr. Abu-Elmagd estimated 3–5 hours, and for the lifting, the reviewer moves her up from being able to lift ten

---

Plaintiff cites a case from Illinois, where the district court found that Reliance had violated ERISA because it was obligated to render a decision within the given time limit set forth in the statute. *Harper v. Reliance Standard Life Ins. Co.*, No. 07 C 3508, 2008 WL 2003175, at *7–9 (N.D. Ill. May 8, 2008). The court observed that "it would be manifestly unfair to claimants if plan administrators could extend the process indefinitely by continually requesting additional information." *Id.* (internal citations and quotation marks omitted). Reliance responds that the appeal decision was delayed because of plaintiff's own delay in "providing an updated medical release and refusal to assist Reliance Standard in identifying and obtaining records from her own health care providers" and her delay in responding to Dr. Shipko and Dr. Dean's reports. Defs.' Reply at 6–7. And the record supports the notion that some portion of the delay was attributable to plaintiff.

ERISA regulations provide that a decision on an appeal must be granted within forty-five days after the appeal is filed, unless an extension is necessary under "special circumstances," in which case an additional forty-five days is allowed. 29 C.F.R § 2560.503-1(i)(1), (i)(3)(i). The regulation also recognizes that the time period can be tolled due to a claimant's failure to submit information necessary to decide a claim." *Id.* § 2560.503-1(i)(3)(4). Plaintiff may be correct that as a matter of law, Reliance did not make a timely decision under the ERISA regulations. However, the Court does not reach this issue because even if the Court considers the medical reports provided after the second deadline extension, and it considers everything plaintiff has put forward, it would reach the same result.

6      Plaintiff makes a great deal out of the fact that the insurer failed to call for an independent medical examination. But, as Reliance submits, there was no real dispute about her diagnosis and the surgeries she had endured. And plaintiff's own medical records were rather weak in terms of establishing the existence of a disability.

pounds occasionally to being able to lift twenty pounds occasionally and ten pounds frequently.[7]

It is unclear what the reviewer's basis is for elevating plaintiff from "sedentary" to "light" work

since he did not perform any actual testing, but the Functional Capabilities test that plaintiff

would have the insurer rely upon instead also found her partially in the "light" category.

- 5/12/09:  Dr. Shipko's record review:  "No functional impairment on the basis of psychiatric illnesses is noted or otherwise illustrated in the records that I have reviewed and no restrictions and limitations are supported from a psychiatric perspective." A.R. at 315, 319.

This report also adds very little to the equation.   It accurately summarizes what Dr. Noel did and

did not find, and it does not hazard a guess as to what the neuropsychological evaluation means

about plaintiff's functionality.   The conclusion about psychiatric impairment is entirely

reasonable in light of the record as a whole; as Dr. Shipko points out, there is nothing in any

---

[7]     Plaintiff has contended throughout this litigation that the Court should not consider Dr. Shipko's and Dr. Dean's reports because they did not conduct independent medical examinations of plaintiff and are biased because they received payment from Reliance for these and other reviews.  Pl.'s Mem. at 20–22 (arguing that "[b]uttress[ing] one paid non-examining reviewer with another similarly hired to provide uninformed, biased opinions fails to substantiate any basis for denying [plaintiff's] claim")  As Reliance points out, insurance companies are entitled to rely on written reports of consultants "who have done paper reviews of a claimant's medical records to rebut the opinion of the treating physician asserting [that] claimant is disabled." Defs.' Mem. at 24 (internal quotation marks omitted), citing *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1349 (M.D. Fla. 2004); *Weidner v. Fed. Express Corp.*, 492 F.3d 925, 930 (8th Cir. 2007); *Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1279–80 (11th Cir. 2005).  And, several courts have observed that ERISA does not require a plan administrator to obtain an independent medical examination.  *See, e.g., Broyles v. A.U.L. Corp. Long-Term Disability Ins. Plan*, No. C-07-5305 MMC, 2009 WL 3817935, at *6 (N.D. Cal. Nov. 12, 2009), citing *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 879–80 (9th Cir. 2004), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006).

        Even if this were not the case, plaintiff's allegations are not supported by the evidence in the record.  There is nothing remarkable about either doctor's opinion – both accurately describe the state of the record and draw conclusions that are based on that record.  So, there is little need to discount them based on allegations of bias, and indeed, they do not factor heavily in the Court's opinion, which would be the same even if they were excluded entirely.

record that indicates that plaintiff's depression is anything other than mild or that it isn't being well managed medically.

The only other materials proffered to the Court are materials that were not a part of the Administrative Record before the insurer at the time of the appeal.  Plaintiff has submitted a medical and functional capacity assessment prepared by Janice Ragland, M.D., on May 10, 2010, more than two years after plaintiff stopped working. Claims Record Supp. ("C.R.S.") [Dkt. # 21-2] at 249–56.  But there is no legal basis for the Court to consider anything that was not before the insurer in connection with the appeal.  *See Crummett*, 2007 WL 2071704, at *3, citing *Block*, 952 F.2d at 1455 (finding that a review "may only be based on the record available to the administrator or fiduciary at the time the decision was made").  And this really does seem to be getting too remote in time.[8]  It is also unclear what this report is based on since there are no records indicating that Dr. Ragland saw the plaintiff at any time between February 2008 and the preparation of the report.[9]

---

[8]     Plaintiff submits that since the medical conditions remained essentially unchanged, the Court can consider the October 2008 Functional Assessment, the January 2009 psychological assessment by Dr. Noel, and even the May 2010 evaluations by Dr. Ragland and Dr. Abu-Elmagd as relevant to the extent of plaintiff's disability on March 1, 2009.  Pl.'s Reply at 10 (arguing that defendants should have considered Dr. Noel's 2009 assessment).  But that does not necessarily follow, since, as Reliance pointed out, those conditions existed when she was initially cleared to return to work, and her doctor indicated that she could perform some of the necessary tasks in the March 2008 report.  At bottom, plaintiff is asking the Court to assume that plaintiff's condition in March of 2008 was the same as it was six months, a year, and even close to two years later.  It was not unreasonable for the insurer to decline to make that assumption, especially since there are at least some facts in the record that support the conclusion that her condition actually deteriorated over time.

[9]     It is also difficult to have much confidence in a report that indicates, for example, monthly colitis attacks of six to ten minutes duration and a need to be close to a bathroom, when the treating physician, Dr. Abu-Elmagd, indicates that plaintiff does not have colitis at all.  C.R.S. at 259.  *Compare* C.R.S. at 250 *with* C.R.S. at 259.

Finally, plaintiff provides a medical and functional capacity assessment from Dr. Abu-Elmagd dated May 18, 2010.  C.R.S. at 258–73.  It is notable that even at this point, Dr. Abu-Elmagd answers the question, "[h]ow many total hours can a Claimant stand and/or walk during an eight hour workday?" with three hours.  And he answers the question, "[h]ow many total hours can a Claimant sit during an eight hour workday?" with four or more hours.  C.R.S. at 260.  When asked whether plaintiff could alternate between sitting and standing on a continuous basis without experiencing interruption due to pain, the doctor crosses out "pain" and inserts "risk of clotting."  *Id.*  Throughout the assessment, the doctor highlights the fact that plaintiff is on cumadin and is at risk of blood clots, *see, e.g.,* C.R.S. at 263, but that was also the situation immediately after her surgery, so it is unclear whether or why that circumstance has now become disabling.  The form asks if claimant can work an eight-hour day, five days a week, and if she can maintain her work station for four 2-hour increments each day, but it does not ask about part-time work.  Dr. Abu-Elmagd indicates that plaintiff "becomes significantly fatigued" and that "the fatigue can be incapacitating."  C.R.S. at 263.  He notes that pain and fatigue would necessitate periods of rest during an eight-hour work period of more than three hours, and that it would reduce her productivity in an eight-hour day by thirty-six percent or more.  *Id.*  At bottom, even if the Court were permitted to take it into consideration, while the report could fairly support a disability decision, it does not necessarily render the insurer's decision – especially if the test is whether she could perform any work – to be unreasonable.

Looking at the entire record, including all of the materials that plaintiff and defendants have submitted over the objection of the other, this is a very close case.  Plaintiff did little to meet her burden under the policy to demonstrate that she was disabled, but defendants have

failed to point to much evidence to support the finding that she is not, even under a deferential standard of review.

**B. The Court cannot assess the reasonableness of Reliance's decision because it is not clear what the grounds for the decision actually were.**

While the Court's review of Reliance's decision is highly discretionary, Reliance still must provide enough evidence to support a finding that the decision was reasonable and supported by the record. *See Block*, 952 F.2d at 1454. In order to make that finding, it is essential that the Court understand what the decision was: what did the plan administrator find and what were the grounds for that decision? Based on the record submitted by Reliance, particularly the letter it sent plaintiff denying the claim for benefits, the Court cannot answer those questions. While the discussion of plaintiff's medical condition is not difficult to follow, it is not clear how Reliance plugged those facts into the rubric established under the Policy.

The denial letter is ambiguous in many respects. First, the letter discusses plaintiff's work during the Elimination Period and concludes that she was "actively at work" in excess of the 160 hours allowed under the Plan. A.R. at 114. Based on this information, Reliance concludes that she was "capable of performing the material duties of her own occupation at the time that she was released to work on 11/6/07." *Id.* But the Court cannot discern whether the insurer denied the claim on those grounds, because it goes on to discuss the adequacy of the medical evidence in the file as well.

Second, the letter does not address obvious questions raised by the terms of the Policy. For example, the letter does not address whether Reliance considered the question of whether plaintiff was "Partially Disabled" as that term is defined under the Policy. A.R. at 112. The Policy defines that term as:

> [A]s a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period.

A.R. at 10, 112. According to the letter, plaintiff was in the Elimination Period between August 20, 2007 and December 14, 2007. A.R. at 114. The medical evidence discussed by Reliance in the denial letter may support the notion that plaintiff was only partially disabled during the relevant time period. If Reliance had a principled reason for limiting its review of plaintiff's claim to Total Disability, its fails to provide that a reason in the letter, and the fact that the definition of Partial Disability is referenced several times in the denial letter leaves the Court wondering whether such an assessment was made, and if not, why not.

Similarly, the letter fails to address whether plaintiff was assessed for Residual Disability, which is defined as "being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability[.]" A.R. at 10, 112. This policy term is utterly confusing and circular because it equates Partial Disability during the Elimination Period to Total Disability. The record provided to the Court supports a finding that at the very least, plaintiff was Partially Disabled during the Elimination Period, and it is not clear what bearing those circumstances had on the decision.[10]

Under these circumstances, the Court cannot conduct even the deferential review that is contemplated by the ERISA statute in a meaningful way. "Where, as here, a plan administrator has . . . 'fail[ed] to make adequate findings or explain adequately the grounds of [its] decision,' remand to the plan administrator for reconsideration is the appropriate remedy." *Doe v. Mamsi*

---

[10]     Moreover, the law is clear that ambiguities in insurance contracts should be resolved in favor of the insured. *Columbia Cas. Co. v. Columbia Hosp.*, 633 F. Supp. 697, 700 (D.D.C. 1986), quoting *Continental Cas. Co. v. Beelar*, 405 F.2d 377, 378 (D.C. Cir. 1968).

*Life and Health Ins. Co.*, 471 F. Supp. 2d 139, 149 (D.D.C. 2007) (alterations in original), quoting *Kaelin v. Tenet Emp. Benefit Plan*, No. 04-2871, 2006 WL 2382005, at * 4 (E.D. Pa. Aug. 16, 2006); *see also Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 477 (7th Cir. 1998) overruled on other grounds by Hardt v. Reliance Standard Ins. Co., 130 S. Ct. 2149 (2010) (finding that "remand is appropriate where decision-maker fails to make adequate findings or fails to provide an adequate reasoning.")  While the Court is reluctant to remand the matter to Reliance given the time that has already elapsed since plaintiff's claim was initially filed, such action is the only appropriate response given the ambiguities the Court has identified.

## IV.     CONCLUSION

Because Reliance has failed to adequately explain how the evidence in the record supports its determination that plaintiff is not entitled to disability benefits, the Court cannot uphold Reliance's decision.  This case is therefore remanded to Reliance to reconsider its denial of benefits and to explain specifically how the Policy applies to the evidence in the record, which section of the Policy is controlling, and whether the decision is based on findings of Total Disability, Partial Disability, or Residual Disability.   Accordingly, plaintiff's motion for summary judgment [Dkt. # 25] is granted in part and denied in part.  Defendants' cross-motion for summary judgment [Dkt. # 27] is denied.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE:  September 28, 2012